**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:26-cv-25841-LEIBOWITZ**

**PABLO MARIAZZA**,

*Petitioner*,

*v.*

**MIAMI ICE FIELD OFFICE DIRECTOR**,

*Respondent.*

_______________________________________/

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

**THIS CAUSE** is before the Court on Petitioner Pablo Mariazza's ("Petitioner") Petition for Writ of Habeas Corpus [ECF No. 1], filed on August 26, 2026. The Court ordered expedited briefing and entered an Order to Show Cause. [ECF No. 3]. Respondent ("Respondent" or "the Government") filed a response [ECF No. 5] and Petitioner filed a reply [ECF No. 6].

Petitioner has been in the United States since 1999. For most of that time, he has been here illegally. While he has been here, he has amassed a litany of criminal convictions in multiple states; he has been found guilty of grand theft, burglary, and theft by deception. Nonetheless, until very recently the Department of Homeland Security ("DHS") allowed Petitioner to remain in the country under an Order of Supervision ("OSUP"), having concluded he may face torture if he were deported to his home country of Venezuela. But in August 2026, DHS detained Petitioner, revoked his OSUP, and told him that he would be deported to Mexico. Petitioner argues that his present detention by Immigration and Customs Enforcement ("ICE") violates the law. It does not. After careful review of the Petition, the parties' briefing, and the relevant legal authorities, the Petition **[ECF No. 1]** is **DENIED**.

## I. BACKGROUND

Petitioner, a native and citizen of Venezuela, entered the United States in 1999 on a six-month non-immigrant visa. [ECF No. 1 ¶¶ 14, 16; ECF No. 5-1 at 1; ECF No. 5-2 at 3]. He overstayed that visa, but on August 21, 2002, was granted an F-1 student visa to pursue a four-year degree at Miami-Dade College. [ECF No. 5-2 at 3]. When his F-1 visa expired, Petitioner asked DHS to extend his non-immigrant status. [ECF No. 5-2 at 3]. DHS denied that request, concluding Petitioner had failed to "carry a full course of study," and ordered Petitioner to leave the country by November 2006. [*Id.*].

Petitioner did not leave the country, however, and apparently kept himself quite busy. [*See* ECF No. 5-3 ¶¶ 12–24]. From 2007 to 2010, he accumulated no fewer than seven separate sets of criminal charges in Miami-Dade County. [*Id.*]. Those charges included burglary of an occupied dwelling, burglary with assault or battery, grand theft, careless driving, and driving with a suspended license. [*Id.*]. DHS finally caught up to Petitioner in 2015, after he pled guilty to four more criminal charges—two counts of grand theft and two counts of burglary—and was sentenced to three years' probation. [ECF No. 5-3 ¶ 25]. ICE took Petitioner into custody on July 8, 2015, and served him with a Form I-862 that charged him as removable for remaining in the United States longer than permitted, 8 U.S.C. § 1227(a)(1)(B), and failing to comply with the conditions of his admission, 8 U.S.C. § 1227(a)(1)(C)(i). [ECF No. 5-2 at 3]. But after a week in custody, ICE released Petitioner on bond in Miami. [ECF No. 5-6 at 1].

Petitioner's next encounter with DHS came five years later, when he pled guilty to theft by deception in Cumberland County, Pennsylvania. [ECF No. 5-7 at 1]. By that point, Petitioner had accumulated thirteen sets of criminal charges. [ECF No. 5-3 ¶¶ 8–9, 11–26, 30 (detailing charges)]. Petitioner was sentenced to a minimum of seven months' imprisonment. [*Id.* ¶ 30].

On February 3, 2021, an Immigration Judge ("IJ") ordered Petitioner removed to Venezuela, but ordered his removal withheld under the Immigration and Nationality Act ("INA"). [ECF No. 1

¶¶ 18–19; ECF No. 1-2 at 10; ECF No. 5-9]. The IJ found Petitioner removable under four provisions of the INA: 8 U.S.C. §§ 1227(a)(1)(B) (present in violation of law), 1227(a)(1)(C)(i) (nonimmigrant status violation), 1227(a)(2)(A)(ii) (multiple criminal convictions), and 1227(a)(2)(A)(iii) (aggravated felony conviction). [ECF No. 5-9 at 1]. But the IJ also concluded that Petitioner was likely to be tortured in Venezuela for his involvement with a political group opposed to the Maduro regime. [ECF No. 1-2 at 6–7]. Petitioner was released under an OSUP in February 2021. [ECF No. 5-11]. He appealed the IJ's decision to the Board of Immigration Appeals ("BIA") and then to the United States Court of Appeals for the Third Circuit, but was unsuccessful. [ECF No. 1 ¶¶ 21–23; ECF No. 1-4; ECF No. 1-5; ECF No. 5 at 6]. The IJ's order of removal became final after the BIA denied Petitioner's initial appeal on July 30, 2021. [ECF No. 1 ¶ 22; ECF No. 1-4; ECF No. 5 at 7]; *see* 8 C.F.R. § 1241.1(a) (order of removal becomes final "[u]pon dismissal of an appeal by the [BIA]").

On August 1 or 2, 2026, during a routine OSUP check-in in Miramar, Florida, ICE took Petitioner into custody. [ECF No. 1 ¶ 26 (alleging Petitioner was taken into custody on "August 2, 2026"); ECF No. 5-6 (listing the date as "08/01/2026")]. Petitioner had not violated any of the conditions of his 2021 OSUP at the time he was detained. [ECF No. 1 ¶¶ 5, 38].[1] On August 7, 2026, ICE informed Petitioner that he would be removed to Mexico instead of Venezuela, given the IJ's withholding of removal order. [ECF No. 5-3 ¶ 38]. On August 28, 2026, DHS served Petitioner with a Notice of Revocation of Release. [ECF No. 5-13 at 1–2; *see* ECF No. 5-3 ¶ 39]. On August 31, 2026, Petitioner "was afforded an informal interview and given an opportunity to respond to the reasons for revocation of his OSUP." [ECF No. 5-3 ¶ 40].

[1] The Government does not dispute this assertion in its response, and the Court accepts it as true for purposes of this order. [*See* ECF No. 5].

## II. LEGAL STANDARD

The federal habeas statute, 28 U.S.C. § 2241, codifies the federal courts' inherent authority to issue writs of habeas corpus when an individual is "[i]n custody in violation of the Constitution or law or treaties of the United States." *Id.* § 2241(c)(3). "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001). The Supreme Court has held that Section 2241 authorizes this Court to hear challenges to immigration detention. *See Zadvydas v. Davis*, 533 U.S. 678, 687 (2001). "The Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* at 693 (citing cases). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Id.* at 690 (citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)).

## III. DISCUSSION

Petitioner seeks a writ of habeas corpus granting his release on two grounds. First, he argues that DHS revoked his OSUP as a punitive measure, "without identifying any statutory or regulatory purpose for doing so," in violation of his "Substantive" Due Process rights. [ECF No. 1 ¶¶ 49–52]. Second, he argues that DHS failed to afford him notice and a meaningful opportunity to be heard before detaining him, in violation of his "Procedural" Due Process rights and the *Accardi* doctrine, which requires administrative agencies to adhere to their own regulations. [*Id.* ¶¶ 53–63]. Neither argument holds water.

### A. Petitioner's Detention Does Not Violate His Substantive Due Process Rights

The crux of Petitioner's first argument is that when ICE detained him in August 2026, it did so as a punitive measure, in violation of his Due Process rights under the Fifth Amendment. [*See id.* ¶¶ 49–52]. Petitioner asserts—and the Government does not dispute—that he never violated the

conditions of his OSUP, [*id.* ¶ 25], and that DHS never showed that the situation in Venezuela changed such that the basis of his withholding of removal order would be undermined [*id.* ¶ 32]. Petitioner argues that DHS's decision to cancel his OSUP and detain him "bears no reasonable relation to public safety, to ensuring attendance at proceedings, or effectuating [his] removal," thus "transform[ing] a civil regulatory scheme into punitive confinement, which the Fifth Amendment forbids." [*Id.* ¶ 51 (citing *Zadvydas*, 533 U.S. at 690)].

When an alien has been ordered removed, DHS is required by the INA to "remove [him] from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A). Ordinarily, the Government must detain the alien during that 90-day "removal period." 8 U.S.C. § 1231(a)(2)(A). If the removal period expires and the alien is still in the country, the INA allows DHS to detain him in limited circumstances—including, as is relevant here, where the alien has been ordered removed under section 1227(a)(1)(C) (nonimmigrant status violation) or section 1227(a)(2) (criminal offenses). *See* 8 U.S.C. § 1231(a)(6). To be sure, detention under the INA is "civil" and "nonpunitive" in nature, and it cannot be indefinite. *See Zadvydas*, 533 U.S. at 690. Once the initial removal period expires, an alien's detention must be limited "to a period reasonably necessary to bring about the alien's removal from the United States." *Id.* at 689. In *Zadvydas*, the Supreme Court held that civil immigration detention pending removal is "presumptively reasonable" for a period of about six months. 533 U.S. at 701. Beyond that, if "the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.*; *see also Akinwale v. Ashcroft*, 287 F.3d 1050, 1052 (11th Cir. 2002).

Petitioner is not entitled to relief under *Zadvydas*. From the jump, his civil immigration detention is "presumptively reasonable" because it has not exceeded six months. *Zadvydas*, 533 U.S. at 701. The IJ's order of removal became final on July 30, 2021, *see* 8 C.F.R. § 1241.1(a), and Petitioner was not detained pursuant to that order until August 1 or 2, 2026, [ECF No. 1 ¶ 26; ECF No. 5-6].

He has been civilly detained by ICE for about three months as of the date of this Order. [*See* ECF Nos. 1-4, 5-6]. Tellingly, Petitioner didn't argue that he had been detained for over six months in his Petition. He tried to make the point in reply, arguing his *Zadvydas* window closed six months after his removal order became final—that is, all the way back in 2022. [ECF No. 6 at 3–4]. To be sure, "arguments raised for the first time in a party's reply brief are waived." *McKiver v. Sec'y, Fla. Dep't of Corr.*, 991 F.3d 1357, 1365 (11th Cir. 2021). But even beyond that, the cases Petitioner cites only say that the six-month period does not *reset* when an alien is re-detained after being released; that is, his cases address the question of whether the six-month period is consecutive or aggregated, which is irrelevant here. [*See* ECF No. 6 at 3–4]. Petitioner cites no authority that says the six-month period lasts six months from the date his removal order becomes final. "Because [Petitioner's] confinement remains well short of the six-month mark, he sits squarely within the presumptively reasonable window." *Olivera v. Mordant*, 2026 WL 1109406, at *3 (M.D. Fla. Apr. 24, 2026); *see Rocha Vargas v. Miami Fed. Det. Ctr.*, 828 F. Supp. 3d 1374 (S.D. Fla. 2026) (Ruiz, J.) ("[G]iven the relatively short duration of [Petitioner's] detention—[approximately four months]—any constitutional argument for habeas relief separate from the statutory one raised here, *if possible*, would be premature." (first alteration added) (internal citation omitted)).

What's more, *Zadvydas* applies only to aliens "for whom removal [is] 'no longer practically attainable.'" *Demore v. Kim*, 538 U.S. 510, 527 (2003) (quoting *Zadvydas*, 533 U.S. at 690). Beyond conclusory allegations that he "was not likely to be removed in the reasonably foreseeable future," [ECF No. 1 ¶¶ 2, 32–33, 35, 51], the only allegation Petitioner makes on this point is that the conditions in Venezuela "have not changed so as to undermine the basis of Petitioner's order of supervision," [*id.* ¶ 32]. The Court doubts that this constitutes "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future," *Zadvydas*, 533 U.S. at 701, but in any event, ICE told Petitioner it would "attempt to remove him to Mexico as a third-country

removal," [ECF No. 5-3 ¶ 38]. Petitioner doesn't deny or contest that allegation. The fact that DHS has "chart[ed] a new path to remove [Petitioner] to Mexico," rather than to Venezuela, is enough on these facts to rebut Petitioner's argument on foreseeability of removal. *Cf. Olivera*, 2026 WL 1109406, at *3.

**B. Petitioner's Detention Does Not Violate His Procedural Due Process Rights or the *Accardi* Doctrine**

Petitioner's second argument rests on a stale version of the facts. He alleges that DHS never afforded him an informal interview or an opportunity to respond to the revocation of his OSUP. [ECF No. 1 ¶¶ 53–63]. This, he argues, violates his procedural due process rights under *Mathews v. Eldridge*, 424 U.S. 319 (1976), and *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954), a Supreme Court case that says agencies should adhere to their own regulations—in this case, the DHS regulations that govern OSUP revocation, 8 C.F.R. §§ 241.4(l), 241.13. [ECF No. 1 ¶¶ 53–63].

But in response to the Petition, the Government provided a sworn declaration from ICE Deportation Officer Kevin Dorleus (the "Dorleus Declaration") [ECF No. 5-3] that stated Petitioner was served with a Notice of Revocation of Release on August 7, 2026, and was given an informal interview and an opportunity to respond to the reasons for revocation of his OSUP on August 31. [ECF No. 5-3 ¶¶ 39–40; *see also* ECF No. 5-13 at 1–2 (Notice of Revocation of Release)]. Petitioner doesn't deny or contest these assertions in his reply. [*See* ECF No. 6]. Nor does he challenge the adequacy of the interview process he received. [*See id.*]. Instead, Petitioner urges the Court not to credit the Dorleus Declaration because Officer Dorleus did not state that *all* his testimony was based on his personal knowledge and did not include a paper record of the informal interview. [*Id.* at 2].

The burden of establishing entitlement to federal habeas relief lies squarely with the person seeking that relief. *See Romine v. Head*, 253 F.3d 1349, 1357–58 (11th Cir. 2001); *Olivera*, 2026 WL 1109406, at *5 ("In a habeas proceeding, the Government does not bear the burden to definitively prove its administrative perfection. Instead, the burden falls squarely on the petitioner to affirmatively

show that his custody violates the Constitution or federal law."). Petitioner presents no facts that undermine the veracity of the Dorleus Declaration, and the Court sees nothing that would call it into question. The Supreme Court in *Zadvydas* instructed the lower courts to "take appropriate account of the greater-expertise of the Executive Branch, of the serious administrative needs and concerns inherent in the necessarily extensive . . . efforts to enforce this complex [area of law], and the Nation's need to speak with one voice in immigration matters" when adjudicating immigration habeas petitions. 533 U.S. at 700. The Court credits the Dorleus Declaration and finds that Petitioner was afforded adequate notice, an informal interview, and an opportunity to respond to the revocation of his OSUP. No aspect of Petitioner's present detention violates the Due Process Clause.

## IV. CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** that the Petition **[ECF No. 1]** is **DENIED**. The *Clerk* is **DIRECTED** to **CLOSE** this case, and all pending motions are **DENIED AS MOOT**.

**DONE AND ORDERED** in the Southern District of Florida on November 3, 2026.

DAVID S. LEIBOWITZ
UNITED STATES DISTRICT JUDGE

cc: counsel of record